

# IN THE COURT OF CRIMINAL APPEALS OF TEXAS

---

### NO. AP-76,101

---

### RAUL CORTEZ, Appellant

### v.

### THE STATE OF TEXAS

---

### ON DIRECT APPEAL IN CAUSE NUMBER 416-82415-07
### FROM THE 416TH JUDICIAL DISTRICT COURT
### COLLIN COUNTY

---

KEASLER, J., delivered the opinion of the Court in which KELLER, P.J., MEYERS, HERVEY, COCHRAN, and ALCALA, JJ., joined. WOMACK, J., filed a concurring and dissenting opinion in which PRICE and JOHNSON, JJ., joined. JOHNSON, J., filed a concurring and dissenting opinion.

### O P I N I O N

Cortez was convicted in 2009 of capital murder for his participation in a quadruple homicide in 2004.[1] Based on the jury's answers to the special issues set forth in Texas Code of Criminal Procedure Article 37.071, Sections 2(b) and 2(e), the trial judge sentenced Cortez

---

[1] TEX. PENAL CODE § 19.03(a).

to death.[2]  Cortez raises forty-seven issues on direct appeal, and after reviewing his points of error, we conclude that they are without merit.  Consequently, we affirm the trial court's judgment.

## I.  Sufficiency

Cortez claims, in his seventeenth point of error, that the evidence is legally insufficient to support his conviction for capital murder.  The State charged Cortez with intentionally causing the death of Austin York by shooting York with a firearm in the course of committing, or attempting to commit, robbery or burglary.

Under *Jackson v. Virginia*, when assessing whether evidence is legally sufficient to support a conviction, we assess all of the evidence in the light most favorable to the verdict to determine whether "*any* rational trier of fact could find the essential elements of the crime beyond a reasonable doubt."[3]  This standard accounts for the factfinder's duty "to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts."[4]  Therefore, in analyzing legal sufficiency, we "determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict."[5]  Our

---

[2]  *See* TEX. CODE CRIM. PROC. art. 37.071 § 2(g).

[3]  443 U.S. 307, 319 (1979) (emphasis in original).

[4]  *Id.*

[5]  *Hooper v. State*, 214 S.W.3d 9, 16-17 (Tex. Crim. App. 2007).

review of "all of the evidence" includes evidence that was properly and improperly admitted.[6] When the record supports conflicting inferences, we presume that the factfinder resolved the conflicts in favor of the prosecution and therefore defer to that determination.[7] Direct and circumstantial evidence are treated equally: "Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt."[8]

Initially, we observe that Cortez challenges the sufficiency of the evidence, in part, on the ground that the State did not exclude every reasonable hypothesis that exculpated him. In making this assertion, Cortez points to several other individuals who had confessed to committing this offense. Cortez's legal theory, however, is incorrect. We overruled this legal construct in *Geesa v. State*.[9] Therefore, the State was not obligated to discount all of the other persons who confessed to this crime in establishing Cortez's guilt beyond a reasonable doubt.

Viewing the evidence in the light most favorable to the jury's verdict, we conclude that the evidence was legally sufficient. Cortez, his brother Javier, and Eddie Williams

---

[6] *Conner v. State*, 67 S.W.3d 192, 197 (Tex. Crim. App. 2001).

[7] *Jackson*, 443 U.S. at 326.

[8] *Hooper*, 214 S.W.3d at 13.

[9] 820 S.W.2d 154, 155 (Tex. Crim. App. 1991), *overruled on other grounds by Paulson v. State*, 28 S.W.3d 570, 571 (Tex. Crim. App. 2000).

developed a plan to take money from Rosa Barbosa, who worked as a cashier at Cliff's Check Cashing. The plan ended on March 12, 2004, at Rosa's house, with quadruple homicide—Rosa, her nephew Mark Barbosa, and Mark's two friends York and Matt Self each died after being shot in the head.

Several individuals confessed to the murders over the course of approximately three years, but all of them were eventually excluded as suspects by investigators. The murders remained unsolved until May 2007, when Williams's common-law wife informed police that Williams knew who committed the offense. After Williams's father died, Williams told his wife that Javier and Cortez committed the murders. Williams had been friends with Javier and, in the past, Williams had sold marijuana for him. Javier had introduced Williams to his brother Cortez. Williams voluntarily accompanied investigators to the police station, where his confession began. Williams informed investigators that he and the Cortez brothers were involved in the offense. At first, Williams minimized his role but, in the end, he took responsibility for two of the murders.

At Cortez's trial, Williams testified about the events surrounding the execution-style murders. Williams was charged with capital murder and did not have any agreement with the State in exchange for his testimony.

About two weeks before the offense, Williams accompanied Cortez to a pawn shop where Cortez purchased a chrome .25 caliber automatic handgun. They also stopped at a nearby "spy shop" where Cortez purchased handcuffs. Williams returned to the pawn shop

with Cortez to pick up the gun after the requisite waiting period passed. At some point before the offense, Cortez tested the gun by shooting it at the ceiling in his house. Javier was stationed outside in the back yard to determine if he could hear the shot.

On the day of the offense, Javier and Cortez picked up Williams at home in Javier's white, four-door Cavalier and went to Cortez's house. Cortez took out a black pistol-grip shotgun, a .38 caliber revolver, and a chrome .380 automatic handgun. Cortez gave the .380 to Williams and told him that it did not work. The three hung out and smoked marijuana. Javier then asked Williams if he wanted to go with them to a woman's (Rosa's) house and rob her. Javier told Williams that he had been watching Rosa for a while and knew that she would take a blue money bag home from Cliff's Check Cashing to cash checks for illegal immigrants from Mexico. Javier had followed Rosa home the night before the offense and knew that she had a car, which Williams indicated would be used as a getaway car. Javier and Cortez instructed Williams about his role—Williams was to knock on Rosa's door and inquire about a lost puppy. Williams explained his reasons for participating in the offense—he believed that Rosa would have "thousands," and he needed money.

The three set out for Rosa's house on foot. Javier and Williams took one route while Cortez took a separate route. Cortez carried the .38, the .25, plastic zip ties, latex gloves, duct tape, and masks in a black gym bag. Cortez was already at Rosa's house when Javier and Williams arrived. Javier and Cortez then started to put on the latex gloves and masks. Williams noticed that they also put on black gloves over the latex gloves. Cortez carried the

.25, Javier had the .38., and Williams had the .380. Williams knocked on the door and, when Rosa answered, he asked her if she had seen his lost puppy. Cortez and Javier ran around Williams and pushed Rosa down inside the house. Williams observed that Rosa was handcuffed when Javier closed the door. Cortez and Javier then picked up Rosa, took her to her bedroom, and pushed her onto the bed. Rosa's head hit the bed, and she fell to the floor. Cortez taped Rosa's hands behind her back and removed the handcuffs. When Javier asked Rosa where the money was, she told them she did not have any money. Javier then asked Rosa for her alarm pin number and keys to Cliff's Check Cashing. Williams testified that Rosa gave them the keys and code. Williams heard a "pop" after Cortez "disappeared" into Rosa's room.

When Cortez returned to the living room, the three boys—Mark, York, and Self, unexpectedly entered the front door. Cortez "opened fire." Two of the boys headed towards Mark's bedroom, while one went out the front door. Cortez brought the boy back in and put him in Mark's room. Cortez gave Williams the .25, took the .38 from Javier, and ordered Williams to shoot the boys. Williams shot Mark once in the head and shot the other boy twice—once on the shoulder and once in the head. Williams handed the gun back to Cortez, and Cortez shot the third boy in the head. Williams and Javier headed out to Self's truck, which was in the driveway, and heard more shots coming from the house before Cortez exited.

Williams testified that, at some point during the offense, Cortez had taken Williams's

latex gloves because Cortez's got "busted."

Javier drove the three to Cliff's Check Cashing in Self's truck. Javier went inside and ran back outside when the alarm sounded. Javier could not find the safe. Javier told them that Rosa gave them a false alarm code.

Javier then drove them to Cortez's house. Javier and Williams got into Javier's car and followed Cortez, who took over driving Self's truck. Williams asked Javier to drop him off at home, but Javier continued to follow Cortez. They headed south towards Dallas on Highway 75. Javier said, "[W]e'll take this to our grave." Cortez then abandoned the truck in an apartment complex after wiping his fingerprints from the truck. Cortez sat behind Williams in Javier's car and, while they were on the highway, Cortez broke the guns down and threw the pieces out the window. Javier then took Williams home.

Mark's brother and his friend arrived at Rosa's house shortly after the offense and discovered the bodies. Rosa was in her bedroom lying face down on the floor. She had red duct tape around her mouth and a tightened zip-tie around her neck. Her hands were not bound. Mark, York, and Self were in Mark's bedroom. Mark was on his bed with his head hanging toward the floor. York was slumped over at the end of Mark's bed. Self was on the floor near York. Mark's brother observed that Self had a gunshot wound to the head, which dislodged one of his eyes from the socket. Self was still breathing, however, and the paramedics were able to transport him by helicopter to Baylor Hospital. Self later died after his parents decided to remove him from life support.

The Collin County medical examiner testified that there was evidence that Rosa's hands had been bound and that she had been strangled. He stated that Rosa had a blunt-force injury to the left side of her face. She had a gun-shot wound at the back of her head on the left side. The medical examiner also discovered pieces of latex glove stuck to the duct tape that had been wrapped around her head and mouth. The medical examiner testified that York had three gun-shot wounds. One was located at the back-left of York's head. The medical examiner recovered an intermediate caliber bullet that had a blue coating. The second wound was on the right back-side of York's neck, and the third wound was on York's back-right shoulder area. The medical examiner testified that the bullets from those wounds were from a smaller caliber gun. The medical examiner discovered two wounds on Mark—one in the back of his head and one in his right arm. The one in Mark's head came from a smaller caliber gun than the one in the arm. The bullet recovered by the medical examiner from Mark's arm also had a blue coating.

The Dallas County medical examiner testified that Self had a gunshot wound to the back right side of his head. The medical examiner recovered a deformed medium caliber bullet with a blue coating from Self's right lower eyelid.

Including the bullets recovered during the autopsies, investigators recovered some other bullets and shell casings from the crime scene. In all, they recovered five .25 caliber shell casings, six fired .25 caliber bullets, and three fired .38 caliber bullets. A ballistics examiner testified that the .38 bullets had a blue nylon coating. The five .25 caliber casings,

according to the examiner, had been fired from the same weapon. Additionally, the five .25 bullets had been fired from the same weapon. After Williams's confession, investigators went to the home that Cortez had lived in at the time of the offense to determine whether there was any evidence of the "test" bullet that Williams said that Cortez had fired into the ceiling with the .25 Cortez had purchased from the pawn shop. They discovered a hole in the ceiling that had been patched and, in the hole, they found a .25 caliber bullet lodged in plywood. The ballistics examiner matched that bullet with the others recovered during the autopsies and concluded that they had all been fired from the same weapon.

Cortez could not be excluded as a contributor of the DNA on the pieces of latex glove that had been stuck to the duct tape around Rosa's head. Dr. Rick Staub, testifying for the State, maintained that the most discriminating sample taken from the latex pieces showed that only one in 14,910 or 1/149th of the Southwest Hispanic population could be possible contributors. Dr. Staub identified Cortez, a member of the Southwest Hispanic population, as a possible contributor. And regarding another sample, only one in 2,540 of the Southwest Hispanic population could be a contributor, and Dr. Staub identified Cortez as a contributor. Finally, regarding another sample, only one in 1,122 or 1/11th of the Southwest Hispanic population could be a contributor. Dr. Staub again identified Cortez as a possible contributor.

When investigating Williams's account, law enforcement officers asked Williams to guide them to the relevant places that would connect him to Cortez, Javier, and the offense.

Williams showed them the Cortez brothers' parents' house, Cortez's house and workplace at the time of the offense, Javier's home at the time of the offense, the route Williams and Javier took to Rosa's house, the parking space in the apartment complex where Cortez abandoned Self's truck, the pawn shop where Cortez purchased the .25, and the Spy Center shop where Cortez purchased the handcuffs.

Investigators were also able to confirm several facts and circumstances relating to the offense. Among other things, they were able to verify that Cortez had purchased a .25 caliber handgun from the pawnshop in February 2004, five weeks before the murders. They also determined that Cortez had lived at the apartment complex where Cortez abandoned Self's truck. Self's truck had been parked across from Cortez's old apartment unit. Investigators also confirmed that Javier owned a white Cavalier at the time of the offense. Finally, they established that Cortez and Javier had both been customers of Cliff's Check Cashing.

Based on the foregoing, we find that a rational jury could have determined that Cortez intentionally caused the death of Austin York, as a principal or party,[10] by shooting York while in the course of committing or attempting to commit robbery or burglary.[11] We

---

[10] *See Tate v. State*, 811 S.W.2d 607, 607 n.3 (Tex. Crim. App. 1991) ("if the evidence supports a charge on the law of parties, the court may charge on the law of parties even though there is no such allegation in the indictment or information.").

[11] *See Martinez v. State*, 129 S.W.3d 101, 106 (Tex. Crim. App. 2004) (in a capital murder case, when the charge authorizes the jury to convict on more than one theory, a guilty verdict will be upheld if the evidence is sufficient on any one of the theories); *see also Rosales v. State*, 4 S.W.3d 228, 231 (Tex. Crim. App. 1999); *Kitchens v. State*, 823 S.W.2d 256, 258 (Tex. Crim. App. 1991).

therefore overrule Cortez's seventeenth point of error.

In Cortez's eighteenth point of error, he contends that the evidence is factually insufficient to support his capital murder conviction. We overrule this point of error because we have since abolished the factual-sufficiency review by essentially concluding that we were mistaken, at the outset, in holding that Texas law provides for such a standard.[12]

## II. Voir Dire

### A. Challenges for Cause

In points of error one through thirteen, Cortez complains about the trial judge's rulings denying his challenges for cause concerning the following thirteen prospective jurors: Wendy Davis, Maria Ann Turnage, Donald Lee Wahl, Frances Rachea Adams, Tricia Renee Forsyth, Melinda Kay Milner, Carrie Yvonne Monclova, Lisa Ann Steinkamp, Michelle Roberts Herbert, Gayla Lunday, Mark Allen Bulloch, Sterling J. Johnson, Jr., and James Black.

To establish harm, Cortez must show that he asserted a clear and specific challenge for cause.[13] He must also show that he: (1) used all his peremptory challenges; (2) asked for and was refused additional strikes; and (3) was then forced to take an identified objectionable juror whom he would have struck had the trial judge granted his challenge for cause or granted him additional peremptory challenges.[14] Cortez complied with these requirements

---

[12] *Howard v. State*, 333 S.W.3d 137, 138 (Tex. Crim. App. 2011); *Brooks v. State*, 323 S.W.3d 893, 894-95 (Tex. Crim. App. 2010) (plurality op.).

[13] *See Green v. State*, 934 S.W.2d 92, 105 (Tex. Crim. App. 1996).

[14] *Lewis v. State*, 911 S.W.2d 1, 4 (Tex. Crim. App. 1995).

with regard to the venirepersons addressed below.

When the trial judge errs in overruling a challenge for cause against a venireperson, the defendant is harmed if he or she uses a peremptory challenge to remove the venireperson and thereafter suffers a detriment from the loss of the strike.[15] Because Cortez did not receive any additional peremptory challenges, he can demonstrate harm by showing that the trial judge erroneously denied one of his challenges for cause.[16]

When reviewing a trial judge's decision to deny a challenge for cause, we review the entire record to determine if there is sufficient evidence to support the ruling.[17] We give great deference to the trial judge's decision because the judge is present to observe the demeanor and tone of voice of the venireperson.[18] When a venireperson's answers are vacillating, unclear, or contradictory, we accord particular deference to the trial judge's decision.[19] Thus, "'[w]e will reverse a trial court's ruling on these issues only when the record shows a clear abuse of discretion on the trial court's part.'"[20]

---

[15] *Demouchette v. State*, 731 S.W.2d 75, 83 (Tex. Crim. App. 1986).

[16] *See Chambers v. State*, 866 S.W.2d 9, 23 (Tex. Crim. App. 1993).

[17] *Feldman v. State*, 71 S.W.3d 738, 744 (Tex. Crim. App. 2002).

[18] *Id.*

[19] *Id.*

[20] *Garcia v. State*, 919 S.W.2d 370, 389 (Tex. Crim. App. 1996) (quoting *Jacobs v. State*, 787 S.W.2d 397, 402 (Tex. Crim. App. 1990)).

### 1. Wendy Davis

In his first point of error, Cortez complains that Davis was "mitigation impaired" because she was biased in favor of a death sentence. In support, Cortez points to Davis's belief that the death penalty serves society by relieving taxpayers of the obligation of supporting prisoners. Cortez also points to Davis's statement that, if the mitigation issue is reached, the question is really of no concern at that point because "you should know."

After reviewing the entire voir dire, we conclude that the trial judge did not abuse his discretion in denying Cortez's challenge for cause. When the law was correctly and clearly explained to Davis, she indicated several times that she could follow the law and answer each of the specials issues based on the specific evidence in the case. Her statement about one of society's purposes for having the death penalty reflected her personal opinion about society's interests at large, as opposed to her own individual interest. It therefore does not establish that she would refuse to consider mitigating evidence. Further, on the heels of that statement, Davis stated that, in her opinion, a term of life imprisonment would be worse. She then affirmed that she does not believe that the death penalty should always be imposed in capital murder cases.

Regarding the mitigation issue, after making the complained-of remark, the trial judge had Davis review the special issue and then questioned her about it. Davis stated that she would not make up her mind and would consider the issue in light of the evidence.

Davis's answers during voir dire do not show that she was mitigation impaired or that

she would automatically vote to impose a death sentence if the jury found Cortez guilty. We therefore overrule his first point of error.

### 2. Maria Ann Turnage

In point of error two, Cortez contends that Turnage was unqualified because she ignored the trial judge's instructions and researched the case on the Internet. He claims that her history of disregarding the judge's instructions denied him the right to a fair and impartial jury. Next, he contends that Turnage's statements during voir dire show that she was biased in favor of law enforcement because she was married to a police officer. Third, he contends that Turnage indicated that she would place the burden on the defense during the guilt-phase and would place the burden on the defendant to prove that he would not be a continuing danger to society.

Turnage admitted that, after she was selected for voir dire, she looked the case up on Wikipedia to get a general sense of the case. She stated that the Wikipedia account was "pretty incriminating" and "cut and dry." The prosecutor then questioned Turnage in detail about her ability to set aside any opinion that she may have formed and consider only the trial evidence. Turnage affirmed three separate times that she would be able to base her verdict on the trial evidence only. She also stated that she would be able to follow the judge's instructions about how the jury should deliberate.

When defense counsel questioned Turnage and asked her what she could recall about the case from her Wikipedia search, Turnage stated that she read that Cortez had entered the

home with the intent to get some money from a woman, and other than the fact that there were two or three people killed, she did not recall any specifics about the murders. She stated that what she had read indicated to her that Cortez was guilty. Upon further questioning from defense counsel, Turnage stated that nothing she has read would influence her in reaching a verdict.

The totality of Turnage's responses regarding her Wikipedia research do not show that her research would influence her decision. She stated numerous times that she would not consider what she had read and would rely on only the evidence in rendering a verdict. That Turnage violated the judge's instructions before individual voir dire not to conduct any outside research into the case does not mean that she would be inclined to do so again. Turnage's statements do not establish that Cortez was denied a fair and impartial trial as a result of the trial judge's decision to overrule his challenge for cause.

We turn to Cortez's allegation that Turnage was biased in favor of law enforcement. A juror who cannot impartially judge the credibility of the witnesses is challengeable for cause for having a bias or prejudice in favor of or against the defendant.[21] The prosecution asked Turnage whether she would presume that a law enforcement officer was telling the truth. She stated, "Not necessarily" and explained that the ones she has met have "a lot of integrity" and that she did not think that they would lie in court. When the prosecutor informed Turnage that it was the jury's duty to assess the credibility of witnesses without any

---

[21] *Feldman*, 71 S.W.3d at 745.

preset bias for or against any specific type of witness, Turnage stated that she would be able to make such an assessment.

When questioned by defense counsel, Turnage indicated that she would have a difficult time believing that a police officer would take the witness stand and lie under oath. She also affirmed that she would be inclined to believe the testimony of a police officer unless it was later proved that the officer was lying. Finally, she stated that she has a tendency to identify more with the prosecution than the defense based on her life experience and her husband.

When Trunage was admonished about the applicable law, she stated that she would abide by the law. The trial judge was entitled to make a credibility determination based on Turnage's responses when the parties or the trial judge explained to her that she must be an impartial factfinder and judge the case according to the evidence only.[22] The record shows that Turnage's personal views would not prevent her from following the law.[23] Thus, we cannot say that the trial judge's ruling, after his first-hand observation of, and participation in, Turnage's voir dire, was outside the zone of reasonable disagreement.

Finally, we address Cortez's arguments that Turnage was disqualified because she would shift the State's burden to Cortez at the guilt-phase and on the future-dangerousness

---

[22] *See Feldman*, 71 S.W.3d at 744.

[23] *Cf. Smith v. State*, 297 S.W.3d 260, 268 (Tex. Crim. App. 2009) ("A veniremember who can set aside his beliefs against capital punishment and honestly answer the special issues is not challengeable for cause.").

special issue. The record shows that Turnage was rehabilitated on both issues when questioned by the trial judge at the end of the voir dire. In both instances, Turnage stated that she would follow the law. The trial judge acted within his discretion in concluding that Turnage was not challengeable on these issues.

We conclude that the trial judge's decision to deny Cortez's challenge for cause was not an abuse of discretion. We therefore overrule Cortez's second point of error.

### 3. Donald Lee Wahl

Cortez claims that Wahl was unqualified because he would assess the death penalty in any capital case in which the defendant had been found guilty.

In response to certain inquiries on the written questionnaire, Wahl indicated that he generally favored the death penalty. His answers reflected a simplified, uninformed understanding of Texas's death-penalty scheme. Once the scheme, particularly the operation of the special issues, was explained to Wahl during voir dire, he acknowledged that he had learned a lot about the law. He then stated, without reservation, that the future-dangerousness and mitigation issues were extremely important in deciding whether to impose a death sentence. Wahl indicated, at each and every opportunity, that he would follow the law. We therefore conclude that the trial judge did not err in refusing to grant Cortez's challenge for cause. We overrule point of error three.

### 4. Frances Rachea Adams

Cortez contends that Adams was mitigation impaired because Adams stated that she

would not consider a person's upbringing as an excuse for committing a crime. Cortez also asserts the Adams was not qualified because she indicated that beyond reasonable doubt means beyond a shadow of a doubt.

First, Adams was not challengeable for cause simply because she did not consider a particular type of evidence to be mitigating.[24] Nevertheless, when Adams made the statement about a person's upbringing, she was considering its relevance with respect to a person's responsibility for committing the primary offense of capital murder. When she was informed how it may be relevant to the punishment scheme, under the mitigation special issue in particular, she stated that it would be a factor that would have to be considered. The record does not support Cortez's claim that Adams was mitigation impaired.

Next, Cortez's contention about Adams's misunderstanding of the beyond a reasonable doubt burden of proof is not supported by the context in which Adams made the complained-of statement. Adams made the statement while explaining why she supported the death penalty:

> While we are wishing I could also wish that no one would be falsely accused or convicted, but I do believe in the death penalty.
> I believe whenever someone kills someone in cold blood and the circumstances are proven and without a shadow of a doubt and that they are a threat to future society and they have taken another life, then yes, I do believe in the death penalty.

It appears from the context that Adams simply misspoke. When she was questioned

---

[24] *Standefer v. State*, 59 S.W.3d 177, 180 (Tex. Crim. App. 2001).

about her understanding of the beyond a reasonable doubt burden of proof, she never indicated that it meant beyond a shadow of a doubt. Indeed, she appeared to understand the level of proof:

> the only way I know to put it into words is that from all the evidence that I have heard and using all of the means of analysis that I have within me, that I just can't believe that it was another. I can't find anything that would discredit it, the evidence that was presented . . . .

Further, even if we assumed that Cortez's reading of the record is correct, Adams's understanding would have benefitted Cortez by placing a higher burden of proof on the State.

On this record, we cannot conclude that the trial judge abused his discretion in denying Cortez's challenge for cause to Adams. Therefore, we overrule Cortez's fourth point of error.

### 5. Tricia Renee Forsyth

Cortez complains that Forsyth looked up the case on the Internet in violation of the trial judge's instructions. He also contends that Forsyth would automatically assess the death penalty in a capital murder case and would shift the burden to the defense on the future-dangerousness special issue.

Forsyth admitted that she looked up the case on the Internet and stated that she only read about the arrest. The prosecutor explained that Forsyth's prior knowledge of the case would not disqualify her as long as she would not let the information influence her decision and would be able to "wipe the slate clean." Forsyth stated that she would be able to do that. She also agreed that she would follow the judge's instructions not to consider any outside

influence from the media or her friends and family. Nothing in the record indicates that Forsyth's limited research would prevent her from being a qualified juror.

Next, the record shows that Forsyth had some difficulty with understanding the application of the death-penalty scheme when she was questioned by defense counsel. And at times her answers did indicate that she would automatically assess the death penalty if the defendant was convicted of capital murder and that she would require the defense to prove that the defendant is not a future danger. Forsyth made these assertions only when she became confused about the application of the law in death penalty cases. But when she was guided, step-by-step, through a proper application of the law as it relates to a juror's duties, Forsyth stated that she would be able to follow the law and would consider each of the special issues.

The dissent contends that there is no evidence that Forsyth was confused. We disagree. During defense counsel's questioning, Forsyth stated, "I think I need more coffee or something," which she immediately followed up by stating, "I just need a more direct approach a more direct question." The dissent also claims that "Forsyth's earlier answer to the State's questioning ('And again, place absolutely no burden on the defense at that point?' 'Yes') came at the end of a lengthy compound question, and, compared to with the clarity of her later answers, is ambiguous." Again, we disagree. Forsyth's "yes" response followed a direct question about her ability to not place the burden on the State, as required by law. There is nothing in that exchange that lacks "clarity" about her ability to comply with the

law.

Considering Forsyth's voir dire as a whole and giving appropriate deference to the trial judge, we cannot conclude that his ruling was outside the zone of reasonable disagreement.[25]  Therefore, we overrule Cortez's fifth point of error.

### 6.  Melinda Kay Milner

In his sixth point of error, Cortez alleges that Milner was not qualified because she would automatically assess the death penalty upon a guilty verdict and would not give effective consideration of mitigation.

According to the voir dire examination, some of Milner's answers on the questionnaire indicated that she believed that persons convicted of capital murder should be sentenced to death.  But once the law was correctly explained to her during voir dire, Milner indicated that she would not automatically apply the death penalty.  She stated that she would consider the full range of punishment and each of the special issues, including the mitigation issue, according to the law.  She further indicated that if she determined that there was enough mitigating evidence, she would be able to assess a life sentence.  The record in no way supports Cortez's contention.

Cortez also complains that the State improperly defined "society" to include anywhere the defendant may live, including the free world, when questioning Milner and that the State's error disqualified Milner from sitting on the jury.  Cortez cites our decision in *Berry*

---

[25]  *Feldman*, 71 S.W.3d at 744.

*v. State*, in which we determined that the evidence was legally insufficient to support the jury's finding that Berry would be a future danger because her society for the next forty years, before becoming eligible for parole, would be prison.[26] We reasoned that Berry, who had been convicted of murdering her male newborn to hide his existence from her "favored mate," would be about sixty years old and past her child-bearing years.[27]

Our decision in *Berry* is not a model of clarity. But *Berry* should not be read to hold that society in the future-dangerousness special issue refers only to prison society. In *Berry*, we held, based on the unique facts of the case, that the State "did not meet its burden of proving beyond a reasonable doubt that there is a probability that [Berry], if allowed to live, would commit criminal acts of violence in the future so as to constitute a continuing threat, whether in or out of prison."[28] We never eliminated consideration of the free world in calculating future dangerousness under the pre-2007 statutory scheme, which did not permit life without the possibility of parole. Indeed, later, in *Estrada v. State*, we observed that *Berry* did not affect our prior precedent holding that society refers to both prison and the free world.[29] *Berry*'s limited fact situation should not be used as support for the assertion that *Berry* restricted the term society to prison society only.

---

[26] 233 S.W.3d 847, 862-64 (Tex. Crim. App. 2007).

[27] *Id.* at 864.

[28] *Id*. at 863.

[29] 313 S.W.3d 274, 284 (Tex. Crim. App. 2010).

Next, even if we did assume that Cortez's complaint is an appropriate basis for a cause challenge, because Cortez used a nearly identical definition when defining society, he is estopped from complaining about the State's definition.[30]

Cortez has not shown that the trial judge abused his discretion. We therefore overrule point of error six.

### 7. Carrie Yvonne Manclova

In his seventh point of error, Cortez contends that Manclova was not qualified because, based on her answers in the questionnaire, she strongly supported the death penalty and would assess a sentence of death upon a guilty verdict.

The record supports the trial judge's ruling to deny Cortez's challenge for cause. While Manclova may have given answers on the questionnaire indicating her strong support of the death penalty and that she would assess a death sentence upon a guilty verdict in a capital case, when the law was explained to her, she stated that would follow the law. Manclova indicated that she answered the questions based on what she knew at the time. Once she was educated about the trial and sentencing processes, Manclova acknowledged she had reevaluated her position. With respect to the special issues, each time she was questioned, Manclova indicated that she would consider them as required by law. She also affirmed that she would consider mitigating evidence and would be able to assess a life sentence if warranted. The trial judge did not abuse his discretion; thus, we overrule

---

[30] *See, e.g.*, *Druery v. State*, 225 S.W.3d 491, 505 (Tex. Crim. App. 2007).

Cortez's seventh point of error.

### 8. Lisa Ann Steinkamp

In point of error eight, Cortez contends that Steinkamp was unqualified because, according to her questionnaire, she would automatically assess the death penalty upon a guilty verdict and was mitigation impaired. Cortez further complains that Steinkamp could not define reasonable doubt. Finally, Cortez claims that Steinkamp was unqualified because the State incorrectly defined the mitigation special issue's definition of society in violation of *Berry*. Cortez asserts that Steinkamp was biased against the defense.

As with other prospective jurors, Steinkamp's answers on the questionnaire, as discussed during her voir dire, indicated that she would assess the death penalty upon a guilty verdict. However, once the death-penalty sentencing scheme was explained to her, Steinkamp recognized that there was more to consider in assessing punishment than she was aware of when she filled out the questionnaire. She stated that she would answer the questions differently in light of what she had learned about the sentencing scheme. When she was questioned by both parties in detail about the special issues and what is required by jurors in assessing punishment, Steinkamp stated that she would consider the special issues according to the law. She indicated that a life sentence would be appropriate if the State failed to meet its burden on the future-dangerousness issue or there was sufficient mitigating evidence. Nothing in Steinkamp's voir dire, after she had been fully advised of the applicable law, indicates that she would automatically assess the death penalty or that she

was mitigation impaired.

Next, there is nothing in the record that supports Cortez's assertion that Steinkamp was unable to define reasonable doubt. In fact, we cannot find any place in the record of her voir dire where she was asked to define "beyond a reasonable doubt." Moreover, it is not necessary for a prospective juror to be able to define reasonable doubt.[31]

Finally, for the same reasons stated above with respect to prospective juror Milner, we reject Cortez's contention that Steinkamp was unqualified because the State defined to society in the future-dangerousness issue to include the free world.

The trial judge did not abuse his discretion in denying Cortez's challenge for cause. We therefore overrule Cortez's eighth point of error.

### 9. Michele Roberts Herbert

In his ninth point of error, Cortez claims that Herbert was biased against the defense. He contends that Herbert stated that she would not want to support a convicted murderer with her tax dollars. Herbert, in Cortez's opinion, was also mitigation impaired because she would expect the defendant to present mitigating evidence. Cortez further claims that Herbert was unqualified because the State defined society to include the free world in violation of *Berry*.

Looking at Herbert's voir dire as a whole, she stated numerous times that she would consider each of the special issues, including the mitigation issue, as required by law.

---

[31] *See Paulson*, 28 S.W.3d at 571.

Herbert's statement about not wanting to support a convicted murderer with her tax dollars was based on her belief that those who do not show remorse do not deserve to sit in prison for life. However, once Herbert was informed of the death-penalty sentencing scheme, she indicated that, knowing what is at stake, she would consider the special issues as required by law. She indicated that if the mitigating evidence was sufficient to warrant a life sentence, she would not be opposed to imposing a life sentence.

Herbert also indicated on a few occasions that she would like to hear from the defendant on the mitigation issue, but she recognized that a defendant may choose not to testify and may have a good reason for doing so. Understanding this, Herbert attested that she would not hold it against the defendant and would consider the evidence presented. Our review of Herbert's voir dire shows that she was not biased against the defense or mitigation impaired.

Finally, for the reasons stated above with respect to vernirepersons Milner and Steinkamp, we conclude that Herbert was not unqualified to sit on the jury as a result of the State's definition of society.

The trial judge did not err in denying Cortez's challenge for cause. We therefore overrule Cortez's ninth point of error.

### 10. Gayla Lunday

In Cortez's tenth point of error, he contends that Lunday was unqualified because she intentionally sought out information about the case on the Internet, despite having been

admonished not to do so. He further complains that Lunday would automatically assess the death penalty upon a guilty verdict and was mitigation impaired.

Lunday acknowledged that she looked up the case on the Internet after she was called for jury duty. She stated that she found the same information that she had seen or heard before—that four people had been killed. She maintained that she wanted to check and see if this was a murder case. When the prosecutor explained to Lunday that she would have to guarantee that she would not subject herself to any outside influences if she was selected, Lunday agreed with the statement. Lunday also assured the prosecutor that any information that she had about the case would not influence her as a juror; she agreed that she could start with a "clean slate."

The entirety of Lunday's voir dire shows that she would not automatically assess a death sentence or that she was mitigation impaired. She indicated that she would carefully consider the future-dangerousness and mitigation special issues. Lunday acknowledged that a life sentence may be appropriate in a capital case, depending on the facts of the case. Similar to other prospective jurors, Lunday acknowledged that her opinions on imposing the death penalty, as reflected in her questionnaire, were made without knowledge of the death-penalty sentencing scheme. Once the law was explained to her, Lunday indicated that she would be able to follow the law. She also stated that she believed that the current death-penalty sentencing scheme is a good one, and that, if she were the "Queen of Texas" and could change it, she would not implement any changes.

The trial judge, based on the record, did not abuse his discretion in denying Cortez's challenge for cause to Lunday. Point of error ten is therefore overruled.

**11. Mark Allen Bulloch**

Cortez, in his eleventh point of error, claims that Bulloch strongly supported the death penalty and would therefore automatically assess it in a death penalty case and would not properly consider mitigation evidence.

During the prosecution's inquiry on voir dire, Bulloch stated that he could see a situation in which the capital crime, on its own, would warrant a finding of future-dangerousness. He also stated that he could foresee the opposite situation. After the prosecutor explained the mitigation special issue, noting that it is up to each individual juror to determine what evidence is mitigating, Bulloch stated that he would be willing to consider mitigation. He stated that he could foresee a situation in which he reached the mitigation issue and, based on the evidence, would find sufficient mitigating evidence that would cause him impose a life sentence. Bulloch stated that each of the special issues were separate and therefore required separate consideration. He agreed that there were a lot of considerations in assessing punishment in a death penalty case beyond just whether the defendant committed the crime intentionally.

On his questionnaire, Bulloch stated that genetics, circumstances of birth, upbringing, and environment should not be considered in assessing punishment. When the prosecution inquired further, Bulloch in the end, realized that those factors, while not relevant to deciding

guilt, are nevertheless relevant in answering the future-dangerousness and mitigation special issues.

When the defense questioned Bulloch about whether he would automatically answer the future-dangerousness issue in the affirmative simply because he found the defendant guilty, Bulloch stated that he would not make such a finding; it would depend on the circumstances. Bulloch also explained his strong support of the death penalty, asserting that he supports it when it is warranted. He believed that its purpose is to protect society. He stated that those who commit capital crimes rarely change their habits. Bulloch also acknowledged that, on his questionnaire, he had stated that life in prison for capital murder would not be an adequate punishment. Bulloch then asserted that there may be mitigating circumstances that could make him change his mind about that statement.

Bulloch admitted that he would have no problem assessing a death sentence where the defendant intentionally committed the crime with free will, without any justification or defense, and the defendant has been proven to be a future danger. But then Bulloch also stated that if the State failed to prove that the defendant would be a future danger, he would answer the first issue in the negative. Regarding the mitigation issue, defense counsel asked Bulloch if he was the type of person that would conclude that any mitigating evidence will not justify putting the defendant in the position of hurting others. In response, Bulloch stated:

> Well, I will take into consideration that Number 3 is there for a reason, and yeah, you're right, once I am there I have pretty much made my decision, but

I also have an open mind where I have to consider Number 3 at least, but it would have to be a whole lot in Number 3 for me to change my mind on death or life. It would have to be really incredible to be honest.

. . .

I would say it's not likely to happen, it's extremely unlikely to change my mind, but again Number 3 is there for a reason. I will consider it fairly, but honestly it would have to be something really incredible on Number 3 for me to change my mind.

Bulloch's statements, contrary to Cortez's contention, do not support the conclusion that Bulloch was mitigation impaired. Bulloch's opinion is consistent with the law. The mitigation issue permits the jury to determine what evidence is mitigating and what quantum of evidence is needed to impose a life sentence.

On this record, we cannot say that the trial judge's decision to deny Cortez's challenge for cause was outside the zone of reasonable disagreement. Bulloch's voir dire does not establish that he would automatically impose a death sentence or that he would not consider mitigating evidence. Point of error eleven is therefore overruled.

**12. Sterling J. Johnson, Jr.**

In his twelfth point of error, Cortez contends that Johnson was unqualified because he would automatically impose the death penalty upon a guilty verdict and was mitigation impaired.

In his questionnaire, according to the voir dire, Johnson stated that if a defendant is found guilty of capital murder, then the death penalty is warranted. The prosecutor asked Johnson about this statement in light of the three special issues, which Johnson had in front

of him. The prosecutor then explained that a death sentence is not automatic. Johnson indicated that he understood the scheme and that a death sentence may not always be warranted. He would be able to answer the special issues based on the evidence and understood what the jury's responsibilities are in a capital case. Johnson indicated that in assessing punishment, the defendant's guilt for committing the crime would be the most important factor. Johnson asserted that, while he wrote the statement "you do the crime, you do the time" in his questionnaire, he would be able to consider other circumstances and factors when assessing punishment.

Defense counsel questioned Johnson only about his work history and noted that it was the most interesting out of the prospective jurors that defense counsel spoke to so far in this case.

On this record, we cannot say that the trial judge erred in denying Corterz's cause challenge. While Johnson generally supported the death penalty, his initial answers on the questionnaire were given without the benefit of knowing about the death-penalty sentencing scheme. Once Johnson was informed about the scheme and what is required of jurors, Johnson agreed that he could properly answer the questions based on the evidence. Johnson did not continue to assert that the death penalty should be imposed automatically. We overrule Cortez's twelfth point of error.

### 13. Richard James Black

Cortez claims that Black was unqualified because of his possible reaction to graphic

evidence. However, Cortez cannot show harm—the loss of a peremptory strike—because Cortez did not use a peremptory strike on juror Black. We therefore overrule Cortez's fourteenth point of error.

## B. Biased and Prejudiced Jury

In points of error fourteen and fifteen, Cortez claims that he was deprived of a fair trial in violation of the federal and state constitutions because his jury was biased and prejudiced. Cortez claims that this was the result of the trial judge's failure to grant his challenges for cause to the above-named venirepersons.

Because we have concluded that the trial judge did not err in denying any of Cortez's challenges for cause, we hold that Cortez has not established that he was denied a fair and impartial trial. Points of error fourteen and fifteen are overruled.

## III. Venue

In Cortez's sixteenth point of error, he claims that the trial judge erred in denying his motion for a change of venue in violation of the United States and Texas Constitutions. Cortez claims that he could not receive a fair trial in Collin County due to all of the inflammatory and prejudicial pretrial publicity.

A defendant is entitled to a change of venue if the defendant cannot obtain a fair and impartial trial where venue is proper.[32] When pretrial publicity is at issue, the defendant must

---

[32] *Salazar v. State*, 38 S.W.3d 141, 149-50 (Tex. Crim. App. 2001).

show that the publicity was pervasive, prejudicial, and inflammatory.[33]  To determine the

pervasiveness of the publicity, we look to the hearing on the motion and the voir dire

process.[34]  And to determine whether the publicity was inflammatory and prejudicial, we

examine: "1) the nature of the publicity, 2) any evidence presented at the change of venue

hearing, and 3) testimony received from the veniremembers' voir dire."[35]  We review a trial

judge's ruling on a change of venue motion for an abuse of discretion.[36]

Cortez submitted two affidavits.  The affidavits essentially averred that Cortez would

not be able to receive a fair trial as a result of the pretrial publicity.  Cortez also submitted

volumes of media accounts: 288 pages of records identifying aired broadcast recordings from

WFAA, 161 articles from the Dallas Morning News, a DVD of ten reports from KDAF-TV,

videotape containing forty-four broadcasts from KTVT-TV and KTXA-TV, and news stories

from the McKinney Courier-Gazette.   The State submitted six affidavits to rebut Cortez's

claim.  The trial judge did not hold a hearing on the motion, but took it under advisement,

stating that he would make a ruling after voir dire.  The trial judge ultimately denied the

motion.

On this record, we cannot say that the trial judge abused his discretion in denying

---

[33]  *Id.* at 150.

[34]  *Gonzalez v. State*, 222 S.W.3d 446, 449 (Tex. Crim. App. 2007).

[35]  *Id.* at 451.

[36]  *Salazar*, 38 S.W.3d at 150.

Cortez's motion. Even assuming that the publicity was pervasive, as Cortez alleges, Cortez has failed to show how the nature of publicity was prejudicial and inflammatory. He does not point to anything specifically inflammatory and prejudicial in any of the media accounts he submitted in support of his motion for change of venue. Nor has Cortez relied on the venire as a whole to show that the publicity was prejudicial and inflammatory. He fails to establish that any of the panel members were unqualified as a result of the pretrial publicity.[37]

That a case or a defendant has been the subject of media attention, even to the point where it is pervasive, is not inherently prejudicial.[38] Further, as a general rule, we do not regard media accounts that are accurate and objective as prejudicial and inflammatory.[39] In the absence of anything from Cortez that shows that the pretrial publicity was indeed prejudicial and inflammatory, we cannot say that the trial judge abused his discretion by denying Cortez's change of venue motion. We therefore overrule point of error sixteen.

## IV. Errors by the Trial Judge

### A. Permitting the Admission of Improper Victim-Impact Testimony

Cortez claims, in point of error nineteen, that trial judge erred in overruling his objection to Detective Kathy Hudson's victim-impact testimony about the Self family's

---

[37] *See Faulder v. State*, 745 S.W.2d 327, 338 (Tex. Crim. App. 1987) ("one seeking to have his conviction nullified on the ground that he was denied a fair trial by an impartial jury due to adverse pretrial publicity ordinarily must demonstrate an actual, identifiable prejudice attributable to that publicity on the part of members of his jury.").

[38] *Gonzalez*, 222 S.W.3d at 449.

[39] *Id*. at 451.

reaction to their son's condition following the shooting.

Husdon was dispatched to Baylor Hospital on the night of the offense, and while she was there, Self's family arrived. The prosecutor questioned Hudson about the family's arrival at the hospital:

> Q. While you were there[,] did Self's family arrive?
> A. Yes, ma'am.
> Q. Matt's Mom and Dad, younger brother, and I believe there were other family members, but those three are the ones that stood out in my mind.
> Q. That included Nancy Self, his mother, Keith Self, his father?
> A. Yes.
> Q. What happened when they came into the room?
> A. When they came in[,] Matt, of course, was there on the bed and his mom looked at him and she said immediately, "I wouldn't let anyone do this to my son."
> Q. How did she react after that?
> A. Her knees were buckling and she was collapsing right there, and I grabbed a chair with wheel on it and scooted it under her so she wouldn't fall on the ground.
> > [Defense Counsel]: We would object on the grounds of relevance.
> > The Court: Overruled.
> Q. Go ahead and – –
> > [Defense Counsel]: At this time we also object. It's improper timing of victim impact, and it's prejudicial.
> > The Court: Overruled.
> > [Defense Counsel]: Is that overruled?
> > The Court: Yes, I said overruled.
> Q. Go ahead.

First, Cortez's claim is procedurally defaulted because his objection was untimely made.[40]

Next, even if we assumed that the trial judge's ruling was erroneous, on this record,

---

[40] *See* TEX. R. APP. P. 33.1.

we cannot find any harm.[41]  In the context of the facts of this case and the insignificance of the complained-of error, we cannot say that Cortez's substantial rights were affected.[42]  We therefore overrule Cortez's nineteenth point of error.

## B.  Allowing the Prosecutor to Improperly Cross-Examine Cortez

In his twentieth point of error, Cortez argues that the trial judge erred by overruling his objections to the prosecutor's cross-examination of Cortez, which referred to an uncalled-witness's fear of Cortez.

When Cortez testified, the following exchange occurred when the prosecutor cross-examined him about his co-worker's fear of testifying against Cortez.

> Q.  As a matter of fact, with regards to Michael Rodriguez, [Cortez's co-worker in Florida,] you're aware that I went down to Orlando, Florida and met with Michael Rodriguez, aren't you?
> A.  No, sir.
> Q.  You're aware of the fact that he is not here is because he doesn't want to testify because he is scared of you and the others – –
>> [Defense Counsel]: I will object as improper cross-examination to state that there is any threat one way or another or fear of a defendant in testifying.
>> [Prosecutor]: That has just been opened.
>> The Court: I overrule that objection.
> Q.  As a matter of fact, the reason he is not coming back here is because he is scared of you and your friends that are still down there in the Orlando area. Isn't that true?

---

[41]  *See Schutz v. State*, 63 S.W.3d 442, 444 (Tex. Crim. App. 2001) (under Rule 44.2(b), "neither the State nor appellant must demonstrate harm when an error has occurred.").

[42]  *See* TEX. R. APP. P. 44.2(b); *Rich v. State*, 160 S.W.3d 575, 577 (Tex. Crim. App. 2005) (quoting *Russell v. State*, 155 S.W.3d 176, 179 (Tex. Crim. App. 2005)) (a substantial right is affected "when the error has a substantial and injurious effect or influence in determining the jury's verdict.").

A.  I do not know, sir.
[Defense Counsel]: We object to the prosecutor testifying without being sworn under oath as a witness, which would be improper and unethical.
The Court: Overruled.
[Prosecutor]: Pass the witness, Your Honor.

It appears that Cortez opened the door, as the State asserted, but once again, assuming that the trial judge's ruling was erroneous and that Cortez properly preserved his claim for our review, for the same reasons with respect to point of error nineteen, we conclude that Cortez's substantial rights were not affected.[43]  Point of error twenty is overruled.

### C.  Denying Cortez's Request for Instructions on Lesser-Included Offenses

In point of error twenty-one, Cortez claims that the trial judge erred in denying his request to instruct the jury on the lesser-included offense of murder.  In point of error twenty-two, Cortez complains about the trial judge's refusal to instruct the jury on the lesser-included offense of aggravated robbery.  In point of error twenty-three, Cortez claims that the trial judge erred in failing to instruct the jury on the lesser-included offense of aggravated assault.  Finally, in point of error twenty-four, Cortez argues that the trial judge erred in failing to instruct the jury on the lesser-included offense of burglary of a habitation.

In determining whether Cortez is entitled to a charge on the lesser-included offenses, we consider all of the evidence introduced at trial, whether produced by the State or the

---

[43]  *See* TEX. R. APP. P. 44.2(b); *Rich*, 160 S.W.3d at 577.

defendant.[44]  We use a two-part test in our review.[45]  First, the lesser-included offense must

be included within the proof necessary to establish the offense charged.[46]  Second, there must

be some evidence in the record that, if the defendant is guilty, the defendant is guilty only

of the lesser-included offense.[47]  This means that "[t]here must be some evidence from which

a rational jury could acquit the defendant of the greater offense while convicting him of the

lesser included offense."[48]  The credibility of the evidence and whether it conflicts with other

evidence or is controverted may not be considered in determining whether an instruction on

a lesser-included offense should be given.[49]

We assume, without deciding, that Cortez has met the first part of the test.  Murder,

aggravated robbery, aggravated assault, and burglary of a habitation can each be lesser-

included offenses of capital murder, depending on the context.[50]  However, we conclude that

---

[44]  *Goodwin v. State*, 799 S.W.2d 719, 740 (Tex. Crim. App. 1990).

[45]  *Rousseau v. State*, 855 S.W.2d 666, 672-75 (Tex. Crim. App. 1993); *Goodwin*, 799 S.W.2d at 740-41.

[46]  *Rousseau*, 855 S.W.2d at 672-75.

[47]  *Id.*

[48]  *Moore v. State*, 969 S.W.2d 4, 8 (Tex. Crim. App. 1998).

[49]  *Banda v. State*, 890 S.W.2d 42, 60 (Tex. Crim. App. 1994).

[50]  *See Santana v. State*, 714 S.W.2d 1, 10 (Tex. Crim. App. 1986) ("murder can be a lesser included offense of capital murder"); *Gongora v. State*, 2006 Tex. Crim. App. LEXIS 2531, at *17 (Tex. Crim. App. Feb. 1, 2006) (not designated for publication) (robbery may be a lesser-included offense of capital murder); *Sanchez v. State*, 745 S.W.2d 353, 357 (Tex. Crim. App. 1988) ("Aggravated assault may be a lesser included offense of attempted capital murder."); *Banda*, 890 S.W.2d at 61 ("Whether burglary and

Cortez has not met the second requirement with respect to any of the lesser-included offenses he contends that he was entitled to have included in the jury charge. There is no evidence that if Cortez is guilty, he is only guilty of murder, aggravated robbery, aggravated assault, or burglary. The evidence establishes that, following a settled plan, Cortez, Javier, and Williams, armed with handguns, forced their way into Rosa's house to steal the money that they believed she brought home from Cliff's Check Cashing. Cortez bound Rosa's hands, put duct tape across her mouth and around her head, and tightened a zip tie around her neck. The three did not find the cash that they sought, however, and Cortez shot Rosa in the head after they retrieved the keys and obtained the alarm code to Cliff's Check Cashing from her. When Mark, Self, and York arrived unexpectedly, Cortez immediately started shooting at them. Once Cortez contained the boys in Mark's bedroom, Cortez directed Williams to shoot them. Williams shot two of the boys, and Cortez shot one of the boys. Finally, before departing from Rosa's house, Cortez shot at all three boys, apparently to ensure that none of them survived. The evidence firmly establishes that Cortez acted with the sole intent to kill York, as a principal or party, while in the course of committing burglary or robbery. On this record, there is no evidence that would have permitted a rational jury to acquit Cortez of capital murder while convicting Cortez of any of the other offenses. We therefore overrule points of error twenty-one through twenty-four.

---

aggravated sexual assault are lesser-included offenses of capital murder needs to be decided on a case-by-case basis.").

## V. Improper Denial of Motion for Mistrial at Guilt

Cortez contends in his twenty-fifth point of error that the trial judge erred in overruling his request for a mistrial after Cortez's ex-wife, Karen Mazariego, improperly injected prejudicial extraneous evidence concerning Cortez's character during the guilt-phase.

The prosecutor asked Mazariego whether, at any point during their marriage, Cortez made a statement about never leaving witnesses. Mazariego answered in the affirmative. When defense counsel cross-examined Mazariego about the date, time, and place that Cortez had made the statement, she stated: "I don't really remember the date, time and place, but it was in a conversation that we had about gangs that he was involved with in Chicago." Defense counsel then asserted, "I would ask the judge to instruct this witness to answer the question that's been asked and to not proffer improper testimony." The trial judge complied with the request. Defense counsel then asked the judge to order Mazariego not to volunteer extraneous matters and to "instruct the jury to disregard the last statement . . . ." The judge also complied with this request. Defense counsel then continued: "Because of this witness' comment we move for a mistrial because she has been instructed by the State to confine her answers to certain matters and she has obviously intentionally violated the instruction from the State." The trial judge denied the request.

To determine whether a trial judge abused his or her discretion in denying a defendant's motion for a mistrial, we consider three factors: (1) the severity of the

misconduct; (2) the measures adopted to cure the misconduct (the efficacy of any cautionary instruction by the judge); and (3) the certainty of conviction absent the misconduct (the strength of the evidence supporting the conviction).[51]

Under the circumstances here, we conclude that the judge's ruling was not outside the zone of reasonable disagreement given the fact that we should assume that the jury followed the trial judge's instruction to disregard[52] and the certainty that Cortez would have been convicted even in the absence of Mazariego's statement. We therefore overrule Cortez's twenty-fifth point of error.

## VI. Admission of Gang-Related Evidence at Punishment

In Cortez's twenty-sixth point of error, citing this Court's opinion in *Kelly v. State*, he contends that the trial judge erred in overruling his objection to gang-expert James Vins's testimony because he was not qualified as an expert.[53] Cortez states that Vins should not have been regarded as "'legally capable' of giving an opinion concerning extraneous conduct of others without a proper nexus or connection to [him]."

---

[51] *Archie v. State*, 221 S.W.3d 695, 699-700 (Tex. Crim. App. 2007) (citing *Ramon v. State*, 159 S.W.3d 927, 929 (Tex. Crim. App. 2004)).

[52] *Gardner v. State*, 730 S.W.2d 675, 696 (Tex. Crim. App. 1987) (there is a presumption that instructions to disregard and other cautionary instructions will be followed by jurors); *see also Young v. State*, 137 S.W.3d 65, 69 (Tex. Crim. App. 2004) ("A grant of a motion for mistrial should be reserved for those cases in which an objection could not have prevented, and an instruction to disregard could not cure, the prejudice stemming from an event at trial—i.e., where an instruction would not leave the jury in an acceptable state to continue the trial.").

[53] 824 S.W.2d 569 (Tex. Crim. App. 1992).

Cortez's challenge to Vins's qualifications as a gang expert was not properly preserved for appellate review.[54]  Before Vins was called to testify by the State, defense counsel requested to "have a preview of what opinions he is going to express."  Counsel then stated, "I fully anticipate he will be qualified as an expert but we would like to have a preview of what he is going to testify to."  The prosecutor then proceeded with a long list of Vins's background and qualifications and summarized what his testimony would cover with respect to the Latin King Nation street-gang.  When the prosecutor finished, defense counsel asserted:

> Your Honor, as far as the Latin Kings he may be qualified to testify.
> We are going to object to any testimony that involves bad conduct or crimes committed by others that this man has no association with without showing a nexus of him to these people.
> It's my understanding from my research that this organization is vast, and what happens in one part of the country doesn't necessarily mean it would be controlled by other people or people who are in and out of the thing.
> I do not believe the State can show by a proper premise enough connection of this man to all the bad conduct and all of the types of offenses that this officer is going to talk about. Especially in Chicago, when this man has lived in this area for the last 19 years – – ten years.  There is a lack of relevance to him, a lack of nexus connecting him.  And to show something of what other people do and other people's offenses that are not tied to him is more prejudicial than probative.

The trial judge overruled the objection.

> In explaining the requirements for admissibility of expert testimony, we have stated:

> The Texas Rules of Evidence set out three separate conditions regarding admissibility of expert testimony. First, Rule 104(a) requires that

---

[54] *See* TEX. R. APP. P. 33.1(a).

'[p]reliminary questions concerning the qualification of a person to be a witness . . . be determined by the court . . . .' Second, Rule 702 states: 'If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.' And third, Rules 401 and 402 render testimony admissible only if it 'tend[s] to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'[55]

Continuing, we observed that these three requirements compel the trial judge to make three separate inquiries—(1) whether the witness is qualified; (2) whether the testimony is reliable; and (3) whether the testimony is relevant.[56] Thus, "[q]ualification is distinct from reliability and relevance and, therefore, should be evaluated independently."[57]

Cortez's objection at trial covered relevance only, as opposed to qualification. In particular, Cortez's complaint went to the "fit" of Vins's testimony to the facts of the case.[58] This had nothing to do with whether Vins was qualified to testify as an expert about the Latin King Nation gang. Cortez's qualifications complaint therefore was not preserved for review.

To the extent that Cortez is challenging the relevancy of Vins's testimony, and

---

[55] *Vela v. State*, 209 S.W.3d 128, 130-31 (Tex. Crim. App. 2006) (internal citations omitted).

[56] *Id*. at 131.

[57] *Id*.

[58] *Id*. at 133 (regarding "fit," "the issue under the reliability and relevance conditions 'is whether the expert's testimony took into account enough of the pertinent facts to be of assistance to the trier of fact on a fact in issue.'") (citing *Jordan v. State*, 928 S.W.2d 550, 556 (Tex. Crim. App. 1996)).

assuming it was properly preserved, we conclude that any such claim is without merit. At sentencing, anything that the judge deems relevant to sentencing, "including evidence of the defendant's background or character . . ." is admissible.[59] The State presented a sufficient nexus between Cortez and the Latin King gang.[60] The State asserted that the evidence would show that Cortez was a member of the gang and that Vins would testify about the gang's known illegal activities in and out of prison. The State further maintained that Vins would explain the meaning and significance of Cortez's tattoos and the appearance of, and postings on, Cortez's MySpace web page as they related to the Latin Kings. Because the evidence established that Cortez was a member of the Latin Kings, a street and prison gang involved in violent crimes and drug-dealing, Vins's testimony was relevant to the jury's punishment determination. We overrule Cortez's twenty-sixth point of error.

## VII. Improper Arguments by the Prosecution

In his twenty-seventh point of error, Cortez argues that the trial judge erred in overruling his objection to the prosecutor's argument misrepresenting defense counsel's argument at punishment. Cortez asserts that the prosecutor misrepresented defense counsel's argument when the prosecutor accused defense counsel of calling him a liar.

During defense counsel's final argument, referring to Williams's decision to testify,

---

[59] TEX. CODE CRIM. PROC. art. 37.071.

[60] *Jordan*, 928 S.W.2d at 555 ("the proffered testimony must be 'sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute.'") (quoting *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 591 (1993)).

counsel stated:

> Do you really think no deal lying Eddie is going to die for this? No. There will be no more deals made in the State of Texas. There will be no more prosecution that can call on a co-defendant because it will not happen. The State, the prosecutors, they don't need to make a deal. They can't make a deal because of the pressure, but he will not die. Why? A little mental retardation.
>
> Last year they decided to execute somebody that couldn't even function like him, but no, that's not going to happen. Besides we have police officers running around and we have got a lawyer here that's not going to let his client testify unless there is a wink and a nod.
>
> After 35 years I can tell you that there are winks and nods. It is wrong? No. It's just what we do, a wink and a nod.

In rebuttal, the prosecutor stated that defense counsel "said something that I need to address, and I guess after 31 years I guess I should be used to being called a liar in a courtroom, and maybe it shouldn't bother me, but when he . . . ." Defense counsel interjected and stated: "If he is saying that I called him a liar that's a total misrepresentation." The prosecutor responded, stating, "That's exactly what I am saying, Your Honor." The trial judge overruled the objection. Defense counsel then requested that the judge instruct "the people in the audience to keep this to themselves." The judge then stated: "I would ask the audience to please control any outbursts, but again, you heard the arguments and you will be bound by your own recollection."

The trial judge did not abuse his discretion in overruling Cortez's objection. During opening statements, the State told the jury that it had not made any deals in exchange for the testimony of its witnesses. Also, Williams testified that he had not reached a deal with the State in exchange for his testimony. But defense counsel's argument concerning a "wink

and a nod" clearly implied that Williams's attorney had previously agreed to some type of deal with the State and that had Williams's attorney not reached a deal, Williams would not have testified. The argument thus implied that the State was lying about not reaching a deal. The prosecutor's response was tailored to address the improper implication that Cortez's counsel deliberately established.[61] The judge therefore did not err in overruling Cortez's objection. We overrule Cortez's twenty-seventh point of error.

In his twenty-eighth point of error, Cortez claims that the trial judge erred in overruling his objection to the prosecutor's statement that Cortez had not shown any remorse for "the crime" committed in Chicago. Cortez also contends that the judge's ruling violated Cortez's Fifth Amendment right not to testify at punishment.

Addressing the lack of mitigation evidence in this case, the prosecutor argued:

What about his family? Only if he had a family that loves him, if only he had had a family an opportunity for education, if only he had had a job, if only he had had moral and spiritual guidance, if only he had had every opportunity – – every opportunity to leave the crime of violence in Chicago, but instead he brought it to Texas.
　　　　But, oh, wait, that was his life. He had a family that loved him, supported him, and would have given him anything if he had asked.

---

[61] *Brown v. State*, 270 S.W.3d 564, 572 (Tex. Crim. App. 2008) ("the record does not support [defense counsel's] insinuations that [the prosecutor] had directed the testimony of witnesses, and given that the insinuations were unreasonable and unfair, [the prosecutor] could properly respond to them."); *see also Borjan v. State*, 787 S.W.2d 53, 55 (Tex. Crim. App. 1990) (citing *Madden v. State*, 721 S.W.2d 859, 862 (Tex. Crim. App. 1986); *Alejandro v. State*, 493 S.W.2d 230 (Tex. Crim. App. 1973)) ("It is well established that proper jury argument must fall within one of the following categories: (1) summary of the evidence; (2) reasonable deduction from the evidence; (3) in response to argument of opposing counsel; and (4) plea for law enforcement.").

And what about remorse for the crime he had committed in Chicago – –

Defense counsel objected, arguing that there is no evidence that he committed any crime in Chicago except possession of marijuana as a juvenile. The judge admonished the jury that it "will be bound by the evidence it heard" and overruled the objection.

First, we observe that Cortez's claim, to the extent that it relies on the Fifth Amendment, was not properly preserved for review.[62] Cortez never mentioned his Fifth Amendment right against self-incrimination when objecting to the prosecutor's statement.

With respect to the remainder of Cortez's claim, we conclude that the trial judge did not err. Cortez's ex-wife testified that Cortez told her about his initiation into the Latin Kings. She explained that Cortez "gave up" members of the Satans gang, which he had previously belonged to, to gain entry into the Latin Kings. Cortez escorted members of the Latin Kings gang to the homes of Satans gang members. Because the Satans were familiar with Cortez, their members would open the door for Cortez, which enabled members of the Latin Kings to kill Satan gang members. Cortez's ex-wife stated that Cortez did not seem remorseful when he relayed this information to her. She also testified that Cortez told her that he used children to sell drugs and had committed numerous robberies as a gang member. When talking about the robberies, Cortez told her that "the rule" was not to leave any witnesses behind. According to Cortez's ex-wife, Cortez never expressed any remorse for the "things" he had done as a Latin King. Finally, she testified that Cortez shot a Satans's

---

[62] *See* TEX. R. APP. P. 33.1(a).

gang member because the individual had shot his brother Javier. Again, Cortez did not appear to have any remorse when he relayed the story to her. In this instance, the prosecutors statement merely summarized the testimony of Cortez's ex-wife.[63] Cortez had not expressed remorse for the crimes he committed as a Latin King gang member in Chicago. We therefore overrule Cortez's twenty-eighth point of error.

## VIII. Improper Denial of Motion for Mistrial at Punishment

In his twenty-ninth point of error, Cortez argues that the trial judge erred in overruling his motion for a mistrial because the State violated Cortez's Fifth Amendment right not to testify. Cortez claims that the trial judge should have granted his motion because the prosecutor looked directly at him when questioning what Rosa's reaction was on the night of the offense.

During his closing, the prosecutor made the following argument: "You cannot breathe new life into these lungs again, and you cannot restore the beat in their hearts. There will be unanswered questions. We'll never know if Rosa struggled, did she fight – – [.]" Defense counsel objected, stating,

> [W]e object to her addressing the defendant. I would like the record to reflect that she walked across the room and looked at Mr. Cortez square in the eye and asked that question. He has the right not to testify, he has a right not to have her point that out. We object to the fact that she asked him a direct question in violation of the Fifth Amendment.

The trial judge sustained the objection, and upon defense counsel's request, the judge

---

[63] *See Borjan*, 787 S.W.2d at 55.

instructed the jury to disregard the statement. Defense counsel then moved for a mistrial, but the judge denied the request.

When determining whether the judge erred in the context of punishment, we consider three factors: (1) the severity of the misconduct; (2) the measures adopted to cure the misconduct (the efficacy of any cautionary instruction by the judge); and (3) the certainty of the assessed punishment absent the misconduct (the strength of the evidence supporting the punishment assessed).[64]

Assuming that the prosecutor's remark, coupled with her demeanor towards Cortez, amounted to a comment on, or inference about, Cortez's failure to testify, we begin by observing that the complained-of conduct was a extremely brief. Further, the trial judge immediately sustained defense counsel's objection and then, at the defense's request, instructed the jury to "disregard" the prosecutor's conduct. Again, we presume that they followed the judge's orders.[65] Further, considering the strong evidence establishing that Cortez would be a future danger, as shown below, it is reasonable to conclude that the jury would have assessed a death sentence even in the absence of the prosecutor's conduct. We therefore overrule this point of error.

## IX. Sufficiency of the Evidence to Support Future-Dangerousness

In Cortez's thirtieth point of error, he contends that the evidence was insufficient to

---

[64] *Archie*, 221 S.W.3d at 699-700 (citing *Ramon*, 159 S.W.3d at 929).

[65] *Gardner*, 730 S.W.2d at 696.

support the jury's future-dangerousness finding.

A jury may consider a variety of factors when determining whether a defendant will pose a continuing threat to society.[66] In reviewing the sufficiency of the evidence, we view all of the evidence in the light most favorable to the jury's finding and determine whether, based on that evidence and reasonable inferences therefrom, a rational jury could have found beyond a reasonable doubt that the answer to the future-dangerousness issue was "yes."[67]

As noted above, Cortez's ex-wife testified that he was a member of the Latin Kings and that Cortez "gifted" the Latin Kings members of his former gang, the Satans, in order to become a Latin King. In doing so, Cortez took members of the Latin Kings to the homes of Satans gang members so that the Latin Kings could execute them. Cortez also told her that he used children to sell drugs and had robbed a number of people, always following "the rule" not to leave any witnesses to the robberies behind. Vins affirmed that the Latin Kings were known to be a violent gang involved in numerous crimes over the years.

Cortez also told his ex-wife that he had shot a member of the Satans because that individual had shot Javier. Cortez's ex-wife also testified that Cortez had connections to members of the Mexican Mafia. Cortez's ex-wife had been raped by her stepfather, and Cortez offered to use his connections with members of the Mexican Mafia to have her stepfather raped while he was in prison. Cortez also told her that if he went to prison,

---

[66] *Wardrip v. State*, 56 S.W.3d 588, 594 (Tex. Crim. App. 2001); *see also Keeton v. State*, 724 S.W.2d 58, 61 (Tex. Crim. App. 1987).

[67] *Ladd v. State*, 3 S.W.3d 547, 557-58 (Tex. Crim. App. 1999).

members of the Mexican Mafia could probably get him out.

Cortez's ex-wife further testified that Cortez told her that he had beaten a co-worker with a brick in Plano and that Cortez did not express any remorse when he told her about it. She said that the co-worker refused to call the police and report the incident because he was an illegal immigrant.

A former roommate of Cortez's testified that he came home one day and saw that Cortez was holding a gun. When the roommate inquired about the gun, Cortez pointed the gun at his roommate and accused him of breaking into his room and stealing "stuff." The roommate denied the accusation and left. The roommate then moved out.

The evidence about Cortez's life shows that he has a long history of being involved with violent crime—some as violent as the instant capital offense. And Cortez displayed no remorse or regret for any of the crimes that he told his ex-wife about. It is not unreasonable to conclude that this established pattern of brutality would continue. The evidence here was sufficient to support the jury's finding that Cortez would constitute a continuing threat to society. We overrule point of error thirty.

## X. Improper Denial of Motion for a New Trial

Cortez complains, in his thirty-first point of error, that the trial judge erred in denying his motion for a new trial because the jury was coerced into rendering its punishment determination. Cortez maintains that jurors were coerced because the bailiff told them they would be deliberating into the late hours of the night.

At the hearing on Cortez's motion for a new trial, Cortez presented testimony from Dr. Kelly Renee Goodness, who was hired by the defense after trial to determine whether there had been any jury misconduct during Cortez's trial. Dr. Goodness stated that five of the jurors spoke to her. Dr. Goodness maintained that in speaking with one of the jurors, he indicated that he was concerned that there had been a coercive nature to the punishment deliberations. The jury informed Dr. Goodness that the bailiff had told the jury that they would "keep going until 1:00 or 2:00 in the morning – – that if they kept going until 1:00 or 2:00 in the morning they would be allowed a hotel room, with it being implied that this would go until 1:00 or 2:00 in the morning." The juror also told Dr. Goodness that "he wished that he knew the rules ahead of time and that he just felt it implied that they would go until the wee hours of the morning . . . ." On cross-examination, Dr. Goodness stated that the juror had not felt like he was forced to stay late or to reach a verdict. The juror had also told Dr. Goodness that he had not felt "rushed" and that the seven-hour deliberation did not feel that long.

After Dr. Goodness's testimony, defense counsel then requested that the judge take judicial notice about a conversation during the jury's deliberations about the late hour:

> [W]e would ask the court to take judicial notice of a conversation that I believe the court will recall with [defense counsel] back in chambers at about 9:00 o'clock while the jury was out continuing to deliberate, and discussions that were being had with respect to, or my recollection is, with several things, including whether, and at that point [defense counsel] advised the court that he felt that leaving the jury back there without any guidance or any instructions was coercive to them and asked for relief is my recollection.

The judge stated that he recalled the conversation. The prosecutor then asked the judge to deny the motion, stating that the defense failed to prove that any of the jurors felt forced to stay or coerced. The trial judge then denied the motion.

We agree with the prosecution's assessment of the situation. Cortez failed to present any evidence that the jury was coerced in any way to render a sentence. The trial judge therefore did not err in denying his motion for a new trial.[68] We overrule this point of error.

### XII.  Challenges to the Death-Penalty Statute

In point of error thirty-two, Cortez contends that the death penalty statute permits cruel and unusual punishment because it gives jurors too much discretion in determining who lives or dies. We have repeatedly rejected this claim,[69] and Cortez presents nothing to persuade us to overrule these prior cases. Therefore, we overrule this point of error.

In point of error thirty-three, Cortez claims that the death-penalty statute violates the Eighth Amendment because the mitigation special issue sends mixed signals to the jury. We have previously considered the current capital-sentencing statute and have held that the instructions allow jurors to give meaningful consideration and effect to mitigating evidence

---

[68] *See State v. Gonzalez*, 855 S.W.2d 692, 696 (Tex. Crim. App. 1993) (we review a trial judge's decision to deny a motion for a new trial for an abuse of discretion).

[69] *Coble v. State*, 330 S.W.3d 253, 297 (Tex. Crim. App. 2010) (citing *Escamilla v. State*, 143 S.W.3d 814, 828 (Tex. Crim. App. 2004); *Turner v. State*, 87 S.W.3d 111, 118 (Tex. Crim. App. 2002); *Shannon v. State*, 942 S.W.2d 591, 600 (Tex. Crim. App. 1996); *Bell v. State*, 938 S.W.2d 35, 53-54 (Tex. Crim. App. 1996); *Lawton v. State*, 913 S.W.2d 542, 558 (Tex. Crim. App. 1995)).

in accordance with federal law.[70] Cortez provides us with no new argument that persuades us to reconsider our holdings. Point of error thirty-three is overruled.

In Cortez's thirty-fourth point of error, he contends that the death-penalty statute violates due process requirements because it implicitly puts the burden of proof on the defendant with respect to the mitigation special issue. We have observed that the State does not bear any burden of proof on the mitigation issue and that the statute setting out that issue and instructions is constitutional.[71] We decline Cortez's invitation to overrule established law. We overrule his thirty-fourth point of error.

In point of error thirty-five, Cortez complains that the trial judge erred in denying his motion to hold Texas Code of Criminal Procedure Article 37.071 Sections 2(e) and (f) unconstitutional under the Texas Constitution. We have rejected this exact claim in the past, and Cortez has not presented anything to persuade us to revisit it here.[72] We overrule this point of error.

In point of error thirty-six, Cortez contends that the death-penalty is unconstitutional because the mitigation issue fails to require the State to prove the absence of mitigating circumstances beyond a reasonable doubt. We have also rejected this claim and conclude

---

[70] *See Busby v. State*, 253 S.W.3d 661, 667 (Tex. Crim. App. 2008); *Saldano v. State*, 232 S.W.3d 77, 107-09 (Tex. Crim. App. 2007).

[71] *Mays v. State*, 318 S.W.3d 368, 397 (Tex. Crim. App. 2010) (citing *Whitaker v. State*, 286 S.W.3d 355, 370 (Tex. Crim. App. 2009); *Busby*, 253 S.W.3d at 667)).

[72] *Saldano*, 232 S.W.3d at 107-09.

that there is no reason to revisit it here.[73]   Point of error thirty-six is overruled.

In point of error thirty-seven, Cortez alleges that the death-penalty scheme violated his rights against cruel and unusual punishment and due process of law by requiring at least ten "no" votes for the jury to return a negative answer to the future-dangerousness issue. We have previously decided this issue adversely to Cortez's contention.[74]   Cortez presents nothing to persuade us to reconsider the issue.  Point of error thirty-seven is overruled.

Next, Cortez complains, in his thirty-eighth point of error, that the death-penalty statute is unconstitutional because critical terms in the statute are undefined and are therefore vague and indefinite.  Specifically, Cortez points to the terms "probability," "continuing threat to society," and "criminal acts of violence."  We have also rejected this claim,[75] and we see no reason to reconsider it at this juncture.  We overrule this point of error.

In points of error thirty-nine and forty, Cortez alleges that the death-penalty scheme violates his federal and state constitutional rights because it is impossible for the jury to simultaneously restrict the jury's discretion to impose the death penalty while also allowing the jury to consider mitigating evidence against the imposition of the death penalty.  We have

---

[73]   *Id.*

[74]   *Crutsinger v. State*, 206 S.W.3d 607, 613 (Tex. Crim. App. 2006) (citing *Escamilla*, 143 S.W.3d at 828); *Masterson v. State*, 155 S.W.3d 167, 175 (Tex. Crim. App. 2005).

[75]   *Resendiz v. State*, 112 S.W.3d 541, 551 (Tex. Crim. App. 2004).

previously determined that these claims are without merit,[76] and Cortez does not convince us otherwise. Points of error thirty-nine and forty are overruled.

In point of error forty-one, Cortez contends that the trial judge erred in overruling his motion to hold Article 37.071 Sections 2(e) and (f) unconstitutional because it fails to require the mitigation issue to be considered by the jury. We have also rejected this claim in the past,[77] and we refuse to reconsider it now. Point of error forty-one is therefore overruled.

In his forty-second point of error, Cortez claims that the mitigation special issue is unconstitutional because it fails to place the burden of proof on the State to prove aggravating evidence. We have previously rejected this claim as well.[78] There is no reason for us to reconsider our prior decisions here; therefore, point of error forty-two is overruled.

Cortez further complains, in point of error forty-three, that the mitigation issue is unconstitutional because it permits open-ended discretion. This claim, under our precedent, is without merit.[79] Cortez fails to convince us to reconsider it here. Point of error forty-three is overruled.

In point of error forty-four, Cortez claims that the capital sentencing scheme is unconstitutional because it does not allow for meaningful appellate review. This claim has

---

[76] *Saldano*, 232 S.W.3d at 108-09.

[77] *Id.*

[78] *Id.*

[79] *Id.*

also been rejected in the past.[80] There is no reason to revisit it now. Point of error forty-four is overruled.

In point of error forty-five, Cortez also contends that the trial judge erred in overruling his second motion to set aside the indictment as being unconstitutional based on defects in the capital sentencing scheme. We have previously rejected this exact claim,[81] and Cortez has not persuaded us to reevaluate it here. Point of error forty-five is overruled.

Finally, in points of error forty-six and forty-seven, Cortez alleges that all of the aforementioned violations denied him due process and due course of law as prohibited by the federal and state constitutions. We have decided these claims against Cortez,[82] and there is nothing here to persuade us to reconsider them here. These points of error are overruled.

Having overruled all of Cortez's points of error, we affirm Cortez's conviction and sentence.

DATE DELIVERED: September 14, 2011
DO NOT PUBLISH

---

[80] *Id.*

[81] *Id.*

[82] *Id.*